IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

SHIRLEY OLEJARZ,                     )
                        Plaintiff    )
                                     )
        vs.                          )        Civil Action No. 08-1153
                                     )        Chief Magistrate Judge Amy Reynolds Hay
SHALER TOWNSHIP, PA,                 )
                        Defendant    )        Re: Doc. 41


## MEMORANDUM OPINION

In this employment discrimination action, the Plaintiff, Shirley Olejarz ("Olejarz" or

"Plaintiff"), acting pro se, alleges that the Defendant, Shaler Township ("Defendant" or

"Township"), violated her rights under the Age Discrimination in Employment Act ("ADEA"),

29 U.S.C. §§ 621-34, the Family Medical Leave Act of 1993, 29 U.S.C. §§ 2601-2654,

("FMLA"), and the Pennsylvania Human Relations Act, 42 Pa. Cons. Stat. Ann. § 951 et seq.

("PHRA"), when it terminated her employment. Because the Court finds that the Plaintiff has

failed to establish that the Defendant engaged in conduct prohibited by any of these statutes, it

will grant the Defendant's Motion for Summary Judgment (Doc. 41 ).

### I. Background

Olejarz began work as a receptionist/office clerk with the Township in February 1988.

(Doc. 44 Ex. A at 14-15). Except for two short periods in other areas, Olejarz was assigned to

the Township's Water Department where her duties included posting payments, handling billing

and collection, taking telephone calls, writing and scheduling orders, addressing complaints, and

assisting with switchboard duties. (Id. Ex. C. at 31). From 1998 on, she reported to Mary

Rapacchietti Round ("Round"), the Township's Benefits Administrator. Round, in turn, reported to Deborah Vita ("Vita"), who began her employment with the Borough in 1987 and was the Township's Assistant Manager, and to Timothy Rogers, who became the Township's Manager in 1992.

Although her early years with the Township appear to have been problem free, cracks in the employer-employee relationship were evident as early as August 1991. Olejarz contends that from that time until her termination, she was "subjected to a continuous pattern of less favorable and discriminatory treatment . . . This harassment and being 'singled-out' for disparate treatment created a hostile work environment [that] resulted in [her] ultimate terminations [sic]." (Doc. 44 Ex. A pt. 2 at 8). According to the Defendant, performance and attendance issues eroded the parties' relationship and reached a point of no return late in 2005. Following a hearing held pursuant to Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 546 (1984) (holding that public employee is entitled to pretermination hearing including notice of reasons for proposed action, explanation of supporting evidence, and opportunity to present "his side of the story"), the Township's Board of Commissioners ("the Board") terminated the Plaintiff's employment on December 14, 2005. [1] At the time, Olejarz was fifty-eight years old. ( Doc 1 ¶5). [2]

_____

[1] It is undisputed that the Board has final responsibility for hiring and firing Township employees. At the time of the Plaintiff's termination, the seven Board members were: Thomas McElhone and James Boyle, who were in their sixties; William Cross, who was in his early forties; Edward Duss, who was in his late seventies; Susan Fisher, who was in her fifties; and David Shutter, who was also in his fifties.

[2] Other clerks employed by the Township during the Plaintiff's tenure included Patricia Keegan, who began work in 1992, retired in August 2009, and was sixty-five at the time of the Plaintiff's termination. Donna Corman was hired in 1985,continues to work for the Township, and was fifty-five when Olejarz was terminated. Mary Grazier ("Grazier") was employed in 1989, continues to work for the Township, and was fifty-six in December 2005. Gloria Reagle ("Reagle") was employed by the Township from March 1991 until September 2004, and was sixty-three at the time of her retirement.

The day following her termination, Olejarz filed a grievance with Teamsters Local 205, which was pursued to arbitration and resolved in favor of the Township in May 2006. (Doc. 44 Ex. A Pt 2 at 23). No appeal was taken. In September 2006, the Plaintiff dual filed a charge with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission ("PHRC"), alleging discrimination based on age, retaliation, and "harassment and hostile work environment." (Id. at 6). A Dismissal and Notice of Rights was issued by the EEOC in May 2008, and the PHRC case was closed days later. (Id. Ex B at 27, 11). This action was filed in November 2009.

The parties do not agree on the reasons for the Plaintiff's discharge. Olejarz contends that her termination was based on age discrimination and was imposed in retaliation for her exercise of rights protected by the FMLA. The Defendant insists that the Plaintiff's discharge resulted from longstanding attendance issues and poor performance.

## II. **Standard of Review**

Summary Judgment is appropriate only where there are no genuine issues of material fact. Matsushita Elec. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). An issue of material fact is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In other words, if the evidence, however, is "'merely colorable' or is 'not significantly probative,'" summary judgment may, nonetheless, be granted. Equimark Commercial Fin. Co. v. C.I.T. Fin. Serv. Corp., 812 F.2d 141, 144 (3d Cir.1987) (quoting Anderson, 477 U.S. at 249-50).

---

Erika Williams ("Williams") who was twenty-four when the Plaintiff was terminated, worked as an office clerk from March 2004 until her resignation in February 2008.

In evaluating the evidence, the Court must view the facts and the inferences to be drawn therefrom in a light most favorable to the non-moving party.  Anderson, 477 U.S. at 255.  The burden of establishing that no genuine issue of material fact exists rests with the movant. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  At the summary judgment stage, the Court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial.  See Anderson, 477 U.S. at 249.  When examining the record to see if there are genuine issues of material fact, the Court's focus is on issue finding, not on issue resolution.

**III.  Discussion**

    **A**.  **The Claim Based on Age Discrimination**

       **1.  The Analytical Framework**

The Court's task is not to second-guess the Township's decision to terminate the Plaintiff's employment. Rather, it is to determine whether there is evidence to suggest that the decision was motivated by an illegal discriminatory purpose. Claims made under the ADEA and the PHRA are analyzed according to the familiar burden shifting approach set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); see also Smith v. City of Allentown, 589 F.3d 684 (3d Cir. 2009).  Under that approach, once a plaintiff produces evidence sufficient to establish a prima facie case, the burden shifts to the employer to articulate a legitimate nondiscriminatory reason for the adverse employment decision.  See Stanziale v. Jargosky, 200 F.3d 101, 105 (3d Cir. 2000).  If the employer is able to meet this "rather light burden, the plaintiff must discredit the defendant's proffered reason . . . or adduce evidence that the discrimination was more likely than not a motivating or determinative cause of the adverse

employment action." Monaco v. Am. Gen. Assur. Co., 359 F.3d 296, 300 (3d Cir. 2004) (citing Potence v. Hazleton Area Sch. Dist., 357 F.3d 366, 370 (3d Cir. 2004)).

A prima facie case of age discrimination has four elements. A plaintiff must show that she: 1) is over forty; 2) is qualified for the position in question; 3) experienced an adverse employment decision; and that 4) her replacement was sufficiently younger to permit a reasonable inference of age discrimination. Duffy v. Paper Magic Group, Inc., 265 F.3d 163, 167 (3d Cir. 2001). A plaintiff must produce sufficient evidence to convince a reasonable factfinder of each element. Potence, 357 F.3d at 370.

### 2. Analysis

The Defendant does not dispute that Olejarz has established the first three elements of a prima facie case. Olejarz contends that she has also established the fourth in that her job duties were absorbed by two employees, one of whom, Erika Williams ("Williams"), was twenty-four years old in December 2005. The Defendant is willing to presume, arguendo, that this is sufficient. The Court will do the same.

Because the elements of a prima facie case have been established, the Court considers the Defendant's contention that its decision to terminate Olejarz had a legitimate non-discriminatory basis - longstanding deficiencies in the Plaintiff's job performance and attendance. This contention is sufficient to satisfy the Township's minimal burden. Thus, in order to survive summary judgment, the Plaintiff must point to evidence in the record which would allow a factfinder reasonably either to disbelieve the Township's articulated legitimate reason for the termination, or to believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause. See Kautz v. Met-Pro Corp., 412 F.3d 463, 465

(3d Cir. 2005) (quoting Stanziale,  200 F.3d at 105).  Accordingly,  the Court turns next to whether Olejarz has raised a question of fact as to whether the Township's proffered reason for her termination was pretextual.

Proof of pretext does not require evidence of discrimination.  "In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 147 (2000).  This "does not change [the] standard for proving pretext which 'places a difficult burden on the plaintiff.'"  Id. at 467 (quoting Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994)).  "The question is not whether the employer made the best or even a sound business decision; it is whether the real reason is discrimination."  Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1109 (3d Cir. 1997) (quoting Carson v. Bethlehem Steel Corp., 82 F.3d 157, 159 (7th Cir.1996)).  The Plaintiff must present evidence "contradicting the core facts put forward by the employer as the legitimate reason for its decision." Id.

The Township asserts that it terminated Olejarz for performance-related reasons,  including her "continual pattern of abuse of time off, punching in late, returning late from lunch breaks, falling asleep at lunch/breaks, personal phone calls while on the switchboard, ignoring the public works radio, leaving the water department counter unattended/ not acknowledg[ing] the presence of a customer, continually scheduling doctor and other appointments without prior notice, violati[ng] the dress code, continual[ly] . . . 'bucking' management, and negative influence in the office."  (Doc. 43 at ¶ 102).  In attempting to impugn the Township's assertions, Olejarz must

contend with the record evidence bearing on her job performance. [3]  This evidence is summarized

by date and substance:

> ● **August 1991**-  issues were raised with the Plaintiff including the
> need to refrain from placing incoming calls on hold, delay in
> answering the telephone due to conversations with co-workers,
> making excessive personal calls, and leaving her work station too
> often and for too long.  Other issues noted included Olejarz's
> failure to sort mail promptly, her lack of response to base radio
> calls, talking with customers for too long before routing calls,
> failing to wait on customers, and reading the newspaper during
> work hours.  Also cited were her failure to complete and total
> invoices, and neglecting to include a single vendor with multiple
> invoices on a single summary sheet.
>
> (Doc. 44 Ex. A pt. 2).
>
> ● **March 1992** - Olejarz failed to comply with instructions to put
> social security numbers on checks.
>
> (Doc. 47 Ex. 8 at 19).
>
> ● **April 1992** -Two memos regarding overtime requirements were
> placed in the Plaintiff's personnel file. She also received memos
> regarding tardiness, incorrect filing of taxpayer submissions,
> failing to give priority to accumulated mail, and taking time off

---

[3]She should also confront the provisions of Local Civil Rule 56E, which states:

> Alleged material facts set forth in the moving party's Concise Statement of
> Material Facts or in the opposing party's Responsive Concise Statement,
> which are claimed to be undisputed, will for the purpose of deciding the
> motion for summary judgment be deemed admitted unless specifically
> denied or otherwise controverted by a separate concise statement of the
> opposing party.

The Plaintiff specifically denies almost nothing of substance in the Township's Concise Statement, does
not set out contrary material facts, and fails to provide record references to evidence that might support a
view of the facts contrary to the one asserted by the Defendant. Although the Defendant has not
requested that it do so, the Court would be justified in granting the Defendant's Motion based solely on
the Plaintiff's failure to comply with the relevant rule. Because the Plaintiff is acting pro se, however,
the Court will analyze her claims on the merits so that there can be no mistake as to the substantive
inadequacy of those claims.

without permission

(Id.).

● **May 1992** - Olejarz was instructed that if she failed to give adequate notice, her request for time off would be denied. The record also references a "grievance for insubordination regarding overtime requirements by the Township."

(Id.).

● **December 1992** - Olejarz left the earned income tax drawer containing cash at the counter over the weekend in violation of policy requiring that the drawer be emptied and cash placed in the safe.

(Id.)

● **February 1993** - The Plaintiff received a memo regarding excessive tardiness.

(Id.).

● **January 1995** - Olejarz was observed making personal calls while manning the switchboard, ignoring a foreman's radio call, and making a doctor's appointment during working hours. She was warned about making personal calls while working the switchboard, and was seen balancing her checkbook during work hours.

(Id.).

● **October 1997-** A written warning was issued to the Plaintiff for taking lunch out of sequence without prior arrangements. (Id.).

●**August 1999** - A memo was placed in the Plaintiff's file regarding incorrectly placed service orders.

(Id.).

● **November 1999** - Plaintiff was warned about disrupting office routine by failing to take scheduled lunch time.

(Id.).

● **January 2000** - Olejarz was observed spending half an hour on a dental bill, making personal calls, and leaving the office to brush her teeth while another employee was on break

(Id.).

● **February 2000** - Rogers met with the Plaintiff to discuss her job performance.  In response, Olejarz filed a grievance contending that Round and Rogers had leveled unjust accusations "against [her] in the workplace," and that she had "been subjected to verbal abuse . . .  at various times in the past." She also stated that "management ha[d] not shown professionalism or common courtesy to [her] as an employee or human being." This grievance proceeded to the second step, but was not pursued by the Union to arbitration. In submissions associated with the grievance, Olejarz denied making personal calls, but admitted having spent work time trying to resolve the payment due on a dental bill.

(Doc. 47 Ex. 8 at 6).

● **September 2000** - Olejarz was reprimanded for leaving after lunch without notice. One employee was sick at the time, and other had pre-approved early leave. This was said to have been the second incident of this type in a week.  Olejarz entered her supervisor's cubicle to retrieve and copy another employee's schedule.

(Doc. 44 Ex. B at 5).

● **February 2001** - An analysis of Olejarz's sick days from 1998 through 2000 showed that approximately half of the allotted time was taken on a Friday, a Monday, or in conjunction with vacation.

(Id. at 4).

● **March 2001** - A memorandum placed in the Plaintiff's file addressed  mis-assignment of an account number for the Shalercrest Housing Association to individual accounts which required only a name change.  This resulted in the individual having twenty-four water and sewer accounts.
(Id.).

● **September 2002** - Olejarz was warned for failing to terminate a personal telephone call.  She contended that the call was not personal.

(Doc. 44 Ex. A. Pt. 2 at 30).

● **November 2003** - Olejarz was notified that she had exhausted all of her sick leave, and all but one hour of vacation leave for the year.  Further requests for time off beyond that single hour would be considered an abuse of sick time carrying the potential for discipline.

(Doc. 47 Ex. 8 at 11).

● **January 2004** - The Plaintiff overstayed her break for fifteen minutes, and did nothing for ten minutes after she returned.  She then made a personal telephone call that lasted for fifteen minutes.  It was noted that in calendar year 2003, Olejarz had exhausted her paid time off, but had taken an additional fourteen hours. Two different managers asked why the Plaintiff was sitting at her desk doing nothing, spending time walking back and forth to the kitchen, and sleeping upstairs.  While Olejarz was on a personal call, she turned her chair around so that another worker would help a customer at the counter.

((Doc. 44 Ex. A Pt. 2 at 32)

● **February 2004**  - Olejarz failed to retrieve payments from the overnight mail-drop.

(Doc. 44 Ex. B at 4).

● **March 2004**  - Olejarz was reprimanded for failing to recognize a reported gas leak as an emergency. She was also observed making a personal call while a customer waited at the desk, was absent from her desk without authorization, and took an extended break.

(Id., Ex. A pt. 2 at 10).

● **April 2004** - Following a disciplinary meeting addressing the information in her personnel file, Olejarz received a letter from Vita stating:

Due to the consistent nature of those documented complaints regarding your tardiness, abuse of sick time and insubordination, you are hereby placed on 90 days probation effective [ April 1] for the purpose of reviewing your performance in order to determine if your employment with the Township shall continue.

\* \* \* \*

A meeting will be scheduled the week of July 19, 2004 to review any improvement or change in your work behavior, and your Union Steward will be notified to attend this meeting.

Olejarz filed a grievance based on this letter, which was taken to the second step. Following the Step 2 meeting, the Township converted the probation it to a ninety day performance review.

(Id. at 3).

**August 2004** - After taking leave caused by shingles, Olejarz was notified that she had exhausted paid and sick leave for the year as of July 26, and that further absences would require medical documentation unless they were related to a medical condition covered by the FMLA.

(Doc.47 Ex.6 at 6).

**October 2004** - Olejarz made an eighteen minute personal phone call, took lunch out of order, and did not return from break on time.

(Doc. 44 Ex. A Pt. 2 at 32).

**November 2004** - Olejarz was said to have been inattentive to customers and to her job. She frequently left for lunch without notice.

(Id. at 33).

**December 2004** - On one occasion, Olejarz was not at her desk during work hours, and on another she took a telephone call while there was a customer waiting at the counter.

(Id.).

**September 1, 2005** - Olejarz received the following written reprimand from Vita:

> Please be advised this will document a written reprimand into your personnel file for the following:
>
> Monday August 29, 2005
> Late returning from lunch.  Mary Round had to telephone you at home, at which time you told her that you had fallen asleep.  You punched out at 1:02 PM and returned at 2:45 PM.
>
> Tuesday, August 30, 2005 - called off sick for not being able to sleep the night before, and had just taken a sleeping pill that morning.
>
> Wednesday, August 31, 2005 - late to work, punched in at 8:14 AM, stating that you had overslept, and that you would be in "after finishing a piece of toast."
>
> It appears you have also been taking extended breaks and failing [sic] asleep in the upstairs ladies lounge. Coworkers and your supervisor have had to go up and wake you to return from your break.
>
> Continued violations of this type of abuse of time off and not reporting back to work in a timely matter [sic] will result in further disciplinary action.

(Doc. 47 Ex. 8 at 2).

**September 13, 2005** - Per her request, Olejarz was provided with copies of her time cards from the beginning of calendar year 2005. She also received a "second written warning on abuse of time.  A third violation in this regard will result in further disciplinary action."

(Doc. 47 Ex.5 at 3).

**October 2005** - the Plaintiff was given a one day suspension for

time-related abuses including: having exhausted paid time off plus an additional time in 2003 and 2004; exhausting all paid leave for calendar year 2005; and the time-related entries in her personnel folder for 2005. The letter notifying the Plaintiff of the suspension went on to state:

> As of this date, there are 275 minutes documented on your time card of either being late on arrival to work, arriving back from lunch late, or punching out early, which equals 4 hours and 35 minutes for which you have not even been docked pay for time not worked. This included 50 separate incidents since January, 2005.
>
> Additionally, there were two separate incidents when you punched in and out within an hour of arrival (May 20th and September 27th @ 12 minutes each incident), which totals 24 minutes of time for which you were not docked.
>
> Even following the written reprimands of September 1st and September 13th where you were specifically advised that further abuse of time would not be tolerated, between October 3rd and October 23rd, you were
> - late 12 times for a total of 29 minutes,
> - you neglected to punch out for lunch one day,
> - you punched out twice at 4:59 P.M.
> - and you used the last 19 hours of sick time you had left for the year.
>
> Based upon this pattern of behavior, we are compelled to suspend you for one work day . . . without pay. It is imperative that you comprehend the serious nature of this abuse of time, and that any further missed time from now until the end of this year will leave us with no choice but to recommend your termination.

(Doc. 47 Ex. 6 at 2).

At a meeting following Olejarz's receipt of this letter, the Township agreed not to impose the one day suspension provided

13

that Olejarz reported on time for the remainder of the year.

(Doc. 44 Ex. A Pt. 1 at 46).

**November 2005** - Olejarz was reprimanded for violating the Department dress code by wearing tennis shoes without advance permission.

( Doc. 47 Ex. 6 at 5).

**December 2005** - The Plaintiff punched in late on December 6 and 7. As a result, Rogers notified her that a <u>Loudermill</u> hearing was scheduled for December 8. At that hearing, Rogers presented information on behalf of the Township, and Olejarz was given the opportunity to respond. The minutes of that hearing reflect that in October 2005, the Township had waived disciplinary action against Olejarz with the understanding that her failure to report to work on time would result in the possibility of termination. The Plaintiff was late to work twice, and failed to punch out for lunch once.
Olejarz was notified in a letter dated December 14, 2005 that the Board had voted on December 13, 2005 to terminate her employment. The Board cited issues raised at the <u>Loudermill</u> hearing: abuse of time off, tardiness in reporting to work and returning from lunch break, failing to return from lunch break with no advance explanation, taking extended breaks, and falling asleep in the break room. The Board also stated that it had reviewed the Plaintiff's personnel file which included documentation of a "continuous pattern of performance and work issues."

(Doc. 44 Ex. B at 7 Id. Ex. A pt. 2 at 21)).

Olejarz attempts to discredit the Township's assertion that she was terminated for poor performance by contending that she was held to a higher standard of performance than other employees, that rules regarding leave and tardiness were unevenly enforced, and that her duties were assumed - at least in part - by a much younger employee. These disparities in treatment, she says, support an inference that the Township's stated reasons for her termination were pretextual. The court examines these contentions seriatim.

In her Memorandum in Opposition to the Defendant's Motion for Summary Judgment, Olejarz contends that she was subjected to age discrimination when she took medical leave under the FMLA in 2004. Olejarz was required to exhaust her remaining paid leave as part of her FMLA leave. (Doc. 46 at 3). She claims that, in this respect, she was treated less favorably than her co-worker, Karla Bildhauer, who was twenty years younger than Olejarz. According to the Plaintiff, Bildauer "had taken extensive time off in 2003 following the birth of her fourth child. Mrs. Bildhauer returned to work in 2003, and then took vacation over the Christmas/New Years holiday." (Id.). "Plaintiff [does]not feel that all her benefit time should have been exhausted by Defendant when Defendant had clearly not exhausted all Bildauer's benefit time in 2003." (Id.). The problem with this alleged evidence of pretext is that there is nothing in the record - beyond the Plaintiff's mere assertion - to support it.[4] The evidence does not reveal what job Bildauer held, how much paid leave she had accumulated, the type of leave that she took, or how long the leave lasted. As a result, it is impossible to draw any inference of discrimination based on the disparity in treatment alleged.

Next, Olejarz focuses on a memorandum written by her supervisor in 2003. (Doc. 47 Ex. 8 at 11). She contends that this document "inferred that Plaintiff had abused sick time since [her] benefit time for 2003 had been exhausted. Plaintiff cared for her handicapped brother in 2003." A close reading of this memorandum shows that Vita had "a serious concern with Olejarz's

---

[4]Although the Court discusses Olejarz's FMLA claim in a separate section of this Opinion, it notes here that the FMLA reserves to employers "the power to require an employee to substitute any accrued paid leave for leave provided pursuant to the FMLA. See 29 U.S.C. § 2612(d)(2)(B). "An employer may permit an employee to use FMLA leave and sick leave sequentially or may require that the two run concurrently." Slentz v. Republic, Missouri, 448 F.3d 1008, 1010 (8th Cir. 2006) (citing Strickland , 239 F.3d at 1205).

assumption that her requests to utilize sick time for non-sick related events [would] always be approved by management without question." (Id.). Olejarz had been told that she could use paid leave to care for her brother and, as of November 12, 2003, she had taken all but one hour of that leave. Vita did *not*, as Olejarz contends, characterize the time that Olejarz had already taken as an abuse of sick leave. Instead, Vita wrote that *additional* requests for leave in calendar year 2003 would be "considered an abuse of sick time." (Id.). Olejarz does not point to evidence in the record demonstrating that there were younger employees who had taken the maximum annual leave six weeks before the end of the year, or that if there were such employees, their requests for additional sick leave were viewed more favorably. In other words, there is nothing in the November 2003 letter to support Olejarz's claim of age discrimination.

In an attempt to establish pretext, Olejarz next refers to a document entitled "INCIDENT," which appears to summarize the entries in her personnel file. (See Doc. 47 Ex. 8 at 18). She argues that this document shows that Rogers, Vita, and Round "conspired amongst themselves to bear false witness against [her]." (Doc. 46 at 6). In support of this argument, she points to a typewritten note on the margin of the document which states: "HIGHLIGHTED ITEMS ARE OBSERVATIONS MADE BY MARY R. HER IMMEDIATE SUPERVISOR." She then observes that entries which appear to have been highlighted refer to events which took place in 1992, six years before Round was employed by the Township.

The Court finds this argument to be problematic in that the record does not reflect who prepared the summary, its source, who added the typewritten notation, or who highlighted the entries. Given this absence of information and the fact that Olejarz does not challenge the substance of the highlighted entries, the Court cannot conclude that this document provides a

reliable basis for any negative inference regarding the Defendant's discriminatory intent or conduct.

Olejarz next alleges that her claims of age discrimination are supported by the time records of other Township employees during the period extending from 2002 to 2006. According to the Plaintiff, these records show that in 2005 Williams, who was thirty-five years younger than Plaintiff, was late 103 times, where as Olejarz was late on only fifty-eight occasions. (Doc. 46 at 13). In 2004, Williams was late 213 times, while the Plaintiff's late punch-ins totaled 111. In addition, in 2002, 2003, and 2004, Reagle, who was sixty-three at the time of her retirement in 2004, was tardy 260 times, while the Plaintiff was late 183 times. (Id.). During the same three years, Grazier, who was two years younger than the Plaintiff was also late more times than Olejarz. (Doc. 47 Ex. 8 at 10). Commenting on this information, Olejarz states: "[I]f Defendant truly had any issue in regard to employees being tardy, how could it be that in all those years not a single employee, other than Plaintiff, would not receive a written warning?" (Id.). "No other clerk was ever scrutinized in any manner similar to the way that Defendant treated Plaintiff." (Id.).

The Defendant does not deny that it focused unique attention on Olejarz's time records. This was because the Plaintiff "was on different footing than the other clerks." (Id. at 5). Despite having had notice that her tardiness was an issue and having been presented with the "potential consequences, Plaintiff punched in late anyway." (Id.). The Township continues:

> In this context and in view of her persistent and problematic
> employment history, Plaintiff's argument for uniform treatment in
> select areas (e.g. punching in late) has little force. While there is
> evidence that Shaler has been lenient in its enforcement of these
> work rules as to all office clerks, including Olejarz, this fact does

not establish the essential argument espoused by Olejarz - that her
employer should be precluded from requiring a certain level of
compliance on a range of issues involving work rules and common
sense . . . Olejarz may point to evidence that she was not the only
clerk who punched in late during this time period.  However , . . .
other employees were not on the same shaky footing.

(Id. at 5-6).  In his deposition, Rogers also addressed the fact that other Township clerks who had

been late more often than Olejarz were not terminated or reprimanded:

> [T]here were issues that we needed to take a look at with other
> employees, but no one had a file over a period of time, over a body
> of work like Shirley's and, again, that [sic] there are other issues
> than Shirley's attendance . . . . She was a very negative influence in
> the office.  She had a very negative impact on morale in the office.
> Certainly not paying attention to customers when they were at the
> counter was a major issue.  Challenging management, violating the
> dress code and saying to our face, I was wondering when you
> would bring that to my attention.  Asking her when she was sitting
> at her desk staring into space what she was doing, and her answer
> was that she was contemplating her next move when she does the
> same thing day in and day out.
>
> No one wants to fire anybody, and I certainly didn't want to fire
> Shirley, but there was a pattern of behavior that was negative to the
> office.

(Doc. 47 at 27).  In her deposition testimony, Olejarz's supervisor, Vita, explained this difference

as follows:

> A.      [T]here was never really an issue with other people's work
>         performance to make me look at any other pattern of abusive
>         time off.
>
> Q.      So are you saying that but for the other performance issues,
>         the time off and the so-called abuse of time wouldn't have
>         mattered?
>
> A.      Probably not.  I mean, our - I never worked for an employer
>         with a more liberal time-off policy.  If a person needed to
>         have time off for anything, they were granted it.  I mean,
>         nobody was treated any differently.  If there was an

> emergency in the family or if a child was sick or something
> like that, they'd come into my office or Mr. Rogers's office
> and that time was granted. We were always very liberal
> with that.

(Doc. 47 Ex.2 at 21-22). Vita also testified that she had spoken with other clerks when lateness was an issue, but did not recall whether she had placed memoranda in their files. (Id. at 22-23). The record shows that by the time lateness became a focal issue, Olejarz's other performance issues had placed her in a class by herself; the other clerks were not similarly situated. The Court does not find this difference in treatment to be suggestive of age discrimination. This is particularly true where one employee who was treated more favorably with regard to late punch-ins was significantly younger than the Plaintiff, a second was about the same age, and a third was older.

In the remainder of her brief, Olejarz attempts to minimize or explain incidents described in her personnel file. For instance, she admits that in 2005, she "did in fact fall asleep during a break period due to extreme fatigue." (Doc. 46 at 6). She attributes this fatigue to Sarcoidosis, which she says was diagnosed in 1998. (Id.). There is nothing in the record, however, to show that she shared this diagnosis or its side effects with the Township. She also admits that she baked a frozen pie in the Township's oven while she was at work, but stresses that this happened only once in eighteen years. (Doc. 45 at ¶ 93). Olejarz also contends that the Arbitrator considering the reasons for her termination did not have full information regarding her violation of the dress code, and observes that the hearing was not transcribed. (Doc. 46 at 7).

The Court has carefully reviewed the record against the background of the Plaintiff's arguments and has failed to find even a wisp of evidence to suggest that the Township's decision

to terminate her employment was based on age discrimination. The evidence, even viewed in the light most favorable to the Plaintiff, shows that the Township acted not because of her age, but because of longstanding and disruptive problems with her willingness to perform the duties of her job in a conscientious, cooperative, and timely manner.

While it may not seem fair, the law does not require that employers treat their employees alike. In fact, they are free, in fact, to discriminate on a wide variety of grounds without incurring liability. The law prohibits employers only from drawing distinctions based on race, gender, age, disability, or other characteristic that the law has determined to be protected. <u>See</u> <u>Hanson v. Sports Auth.</u>, 256 F. Supp.2d 927, 933 (W.D. Wisc. 2003). Because the Court is convinced that no reasonable factfinder viewing this record could conclude that Olejarz was the victim of age discrimination, the Township is entitled to summary judgment on the plaintiff's ADEA and PHRA claims.

### B.  <u>The Alleged Violation of the FMLA</u>

The FMLA "balance[s] the demands of the workplace with the needs of families" and "entitle[s] employees to take reasonable leave for medical reasons." 29 U.S. C. § 2601(b)(1) and (2). To accomplish these ends, the Act "creates two interrelated, substantive employee rights: first, the employee has a right to use a certain amount of leave for enumerated reasons, and second, the employee has a right to return to his or her job or an equivalent job after using protected leave. 29 U.S.C. §2612(a), 2614(a)." <u>Bachelder v. America West Airlines</u>, 259 F.3d 1112, 1122 (9th Cir. 2001). The FMLA implementing regulation found at 29 C.F.R § 825.220(c) states: "Employers cannot use the taking of FMLA leave as a negative factor in employment actions." <u>Id.</u>

Olejarz contends the FMLA leave she took from July 15, 2004 until August 10, 2004 to recover from a bout with shingles was a negative factor in the Township's termination decision.[5] In order to prevail on this retaliation claim, Olejarz must "show that (1) [s]he took an FMLA leave, (2) [s]he suffered an adverse employment decision, and (3) the adverse decision was causally related to [her] leave." Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 146 (3d Cir. 2004). Only the third element of Olejarz's claim is in dispute.

In order to prove causation, Olejarz relies largely on an August 24, 2004 letter from Vita notifying her that she had exhausted all but one hour of paid leave for the year, and that further absences would need to qualify for coverage under the FMLA. The letter also stated: "Any time off from this date forward must be either due to a medical condition, doctor's appointments or physical therapy. In addition, you will be required to produce documentation verifying your attendance for physician's appointments or physical therapy, or produce a doctor's excuse for time off." (Doc. 47 Ex. 6 at 4). Olejarz takes issue with language in that letter referring to "114.5 hours docked without pay since you were out of sick and vacation time." She states that the letter fails to make clear that those hours constituted leave covered by the FMLA. (Id.)

It is possible that the letter was misinterpreted by the Arbitrator handling Olejarz's post-deprivation grievance. In the decision finding that the Township had just cause to terminate Olejarz, the Arbitrator stated: "[I]n 2004 [Olejarz] used her regular sick leave by the end of July

---

[5]This is the only FMLA leave substantiated in the record. Although the Plaintiff "does feel that the care of her brother in 2003 should have had some type of exception under FMLA," (Doc 45 at ¶ 65), the record does not show that she requested FMLA leave at any point during that year. More importantly, provisions of the FMLA make clear that the Act does not extend to leave taken to care for a sibling. See 29 U.S.C. § 2601 (b) (2) (stating that the purpose of the Act is "to entitle employees to take reasonable leave for medical reasons, for the birth or adoption of a child, and for the care of a child, spouse, or parent who has a serious health condition").

and was docked 114.5 hours by the end of the year because she had no more sick leave or vacation time." (Doc. 44 Ex. B at 39). The Arbitrator may have concluded that the docked hours were hours that Olejarz was not authorized to take. This was not the case.

It is not clear whether the Township Board made the same mistake. Although the termination letter issued by the Township does not mention the August letter, it identifies a host of factors, including a "continual pattern of abuse of time off," to justify its action. (Doc. 44 Ex. A pt. 2 at 21). There is no doubt that the entries in Olejarz's personnel file, including the August 2004 letter, provided the foundation for the finding of abuse. Although the Court recognizes that the "direct" nature of this evidence might be open to debate, in an abundance of caution, [6] the Court assumes that the August letter and the other references in the Plaintiff's personnel file to that letter constitute "direct evidence" that her FMLA leave was a negative factor in the Township's termination decision. Thus, the Court adopts the analytical framework set out by the Supreme Court's in <u>Price Waterhouse v. Hopkins</u>, 490 U.S. 228 (1989), and applied in <u>Conoshenti</u>, 364 F.3d at 147.

---

[6]Plaintiff does not address which analytical approach, <u>McDonnell Douglas</u> or <u>Price</u> <u>Waterhouse</u> governs analysis of her FMLA claim. Although the Court applies the <u>Price Waterhouse</u> framework, the result here would be the same under either. The Court of Appeals for the Third Circuit in both <u>Conoshenti</u> and <u>Smith v. Medpointe Healthcare, Inc.</u>, No. 07-1753, 2007 WL 2055104 (The 3d Cir. April 24, 2009), clarified that a reference to protected FMLA leave in a termination letter is not sufficient to prove retaliation. In <u>Conoshenti</u> , the Court of Appeals, applying the <u>Price Waterhouse</u> analysis, wrote that the "reference to [leave taken under the FMLA] in the termination letter might, in isolation, support an inference that the protected leave was considered in connection with the discharge decision," but this "would not support a finding that [the Plaintiff would not have been discharged . . . in the absence of having taken . . . protected leave." <u>Conoshenti</u>, 364 F.3d at 148. In <u>Smith</u>, the Court considered an employer's letter which "identified FMLA-protected leave as part of its reason for terminating [the plaintiff's] employment." 2007 WL 2055104, at *3. Employing the <u>McDonnell Douglas</u> framework, the Court found that the letter "was insufficient to show [that] Medpointe's legitimate, non-discriminatory reason for terminating her employment - violation of the leave policy - was a pretext for discrimination." <u>Id.</u>

"Under the Price Waterhouse framework, when an FMLA plaintiff 'alleging unlawful termination presents "direct evidence" that his [FMLA leave] was a substantial factor in the decision to fire him, the burden of persuasion on the issue of causation shifts, and the employer must prove that it would have fired the plaintiff even if it had not considered [the FMLA leave]." Id. (quoting Fakete v. Aetna Inc., 308 F.3d 335, 338 (3d Cir. 2002) (applying "direct evidence" analysis to claim under the ADEA)). To establish a likelihood that its decision to terminate Olejarz would have been the same had it not considered Olejarz's FMLA leave, the Township must show that other "sufficient business reasons" would have "induced it to take the same employment action." Id. "The evidentiary scheme essentially requires the employer to place the employee in the same position he or she would have occupied absent discrimination. Id. at 148 ( citing Price Waterhouse, 490 U.S. at 176-77). The Court finds that the evidence in this case, even when viewed in the light most favorable to Olejarz "clearly indicate[s] that [she] would have been discharged absent consideration of [her] FMLA-protected leave." Id.

As the Court detailed in its discussion of Olejarz's ADEA claim, the evidence of shortcomings in the Plaintiff's job performance, attendance, and timeliness is overwhelming. Even if all reference to the Plaintiff's FMLA leave were removed from the record, the remaining evidence is such that the Court is confident in concluding that Olejarz would, nonetheless, have been terminated. This is most clearly illustrated by events occurring in the weeks prior to the termination. In late October 2005, Olejarz was told that if she reported on time for the remainder of the year, her record would be wiped clean: "They said that if I was not late again from October 23 to the end of December 2005, they would fully expunge my personnel file and I would start with a clean record [in] January 2006." (Doc. 44 Ex. N at 8). Thus, at that point, the Township

offered to ignore *all* that had come before.  The only factor to be evaluated was her compliance

with this short-tem attendance requirement. Despite this offer and with full knowledge of the

consequences, Olejarz was late to work twice and failed to punch out one day at lunch time.

The Plaintiff does not deny that she was late to work on December 6, 2005, or that she

was late again on December 7, 2005.  That others were late on the same dates is irrelevant. (See

Doc. 44 Ex. A2 at 12).  Rogers testified at his deposition that on December 7, Olejarz "was at the

time clock.  She waited until I came all the way back [from getting tea] . . . so that I would see

her punching in late.  I have to deal with that . . . It was a defiant issue at times with Shirley."

(Doc. 47 Ex. 1 at 33).  On the same day, Olejarz failed to punch out for lunch.  (Doc. 44 A pt. 2

at 12.).  It was only after these infractions that a Loudermill hearing was held and Olejarz was

terminated.  Based on the record presented to the Court in connection with the pending Motion,

there is no doubt that even absent consideration of her FMLA leave, the Plaintiff's employment

would have been terminated.

Because the Court finds that no rational trier of fact could find in Olejarz's favor on her

claim of retaliation in violation of the FMLA,  the Defendant is entitled to summary judgment on

this claim as well.

**IV**.  **Conclusion**

For the reasons set out above, the Defendants' Motion for Summary Judgment (Doc. 41)

will be granted with respect to all claims.  Appropriate Orders follow.

By the Court,

/s/ *Amy Reynolds Hay*
Chief United States Magistrate Judge

Dated: 3 June, 2010

cc:     Shirley Olejarz
        203 Virginia Avenue
        Glenshaw, PA 15116

        All counsel of record by Notice of Electronic Filing